COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-07-272-CR

 

 

KOREY DEMAINE WALKER                                                    APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I. Introduction








Appellant Korey Demaine Walker appeals his
conviction and sixty year sentence for attempted capital murder.[1]
 See Tex. Penal Code Ann. ' 15.01
(Vernon 2003), ' 19.03 (Vernon Supp. 2009).  In four points, appellant asserts that the
trial court violated his Sixth Amendment right to confrontation and the right
to expose bias on the part of a witness under Texas Rule of Evidence 613(b) by
refusing to allow a line of questioning, that the trial court erred by failing
to include a mistake of fact instruction in its instruction on self-defense,
and that the trial court erred by providing an incomplete and ineffective
limiting instruction regarding prior inconsistent statements used for
impeachment purposes by a State=s
witness.  We affirm.

II. 
Background

A.  The Shooting

On May 8, 2002, appellant pled guilty to
possession of more than four but less than two hundred grams of a controlled
substance.  Appellant did not appear at
his January 10, 2003 sentencing hearing, so the trial court forfeited his bond
and issued a warrant for his arrest.








Tarrant County Sheriff=s
Department Deputy Andrew Tatsch, who was charged with executing appellant=s
warrant, received new information regarding appellant=s
whereabouts from appellant=s
girlfriend, Joyce Williams, on September 11, 2003.[2]  The trial court changed the address of the
warrant, and Deputy Tatsch arranged for three other deputies, Deputies
Hernandez, Johnston, and Pickle, to assist him in executing it.  They met at a Costco near appellant=s
apartment at 6:00 a.m. on September 12, 2003, for a briefing with Deputy
Tatsch.  At the briefing, each deputy saw
a photograph of appellant.

The deputies arrived at appellant=s
apartment around 6:45 a.m.  Over the next
forty-five minutes to an hour, the deputies intermittently knocked on the front
door and announced their presence, getting progressively louder to the point of
banging on the door and yelling for appellant to come out.  Appellant never answered the door, but
Deputies Hernandez, Johnston, and Pickle each independently noticed what they
believed to be someone looking through the blinds.

When appellant did not come to the door, the
deputies asked the apartment complex to bring a key to unlock appellant=s front
door.  Jess Cross, the apartment complex=s maintenance
technician, arrived at appellant=s
apartment around 8:00 a.m. and gave the key to the deputies.  The deputies had contacted a supervisor,
Sergeant White, who arrived about the same time.  When appellant still did not come to the
door, the deputies used the key to attempt to open the door, but the door was
locked from the inside with a keyless deadbolt.








Sergeant White authorized the deputies to breach
the door by force.  The deputies knocked
at least one to two more times, and when there was still no response, Deputy
Tatsch used a ram and forced the door open. 
Deputies Tatsch and Johnston entered the apartment first, followed by
Deputy Hernandez and Sergeant White. 
Once inside, Deputy Tatsch announced his presence, stating, Asheriff=s
department, felony warrant.@








The deputies made their way to the closed bedroom
door.  Deputy Tatsch kicked open the
door.  As the door slammed back shut, a
shot was fired, and Deputy Tatsch was hit by the bullet.[3]  Although Deputy Tatsch did not see a muzzle
flash from a gun, he did see appellant crouched down by the bed in the bedroom,
and he felt the blast hit him.  Deputies
Tatsch and Johnston returned fire through the closed door.  The two deputies then retreated around a
corner as Deputy Hernandez, who was by the front door, called to Deputy Pickle
to get an ambulance.  Deputy Johnston
testified that appellant, holding a gun in front of him, walked over to where
Deputy Johnston was lying on the floor, then, after Deputy Johnston shot at
him, kept going toward the door where he collapsed.  Deputy Hernandez testified that when he
looked back into the apartment, he saw appellant leaving the bedroom with a gun
in his hand.  Fearing for his life,
Deputy Hernandez shot appellant twice. 
All of these events lasted approximately seventeen seconds.

After the shooting was over and appellant was
subdued, Deputy Tatsch was taken to a hospital, where he was treated for his
gunshot injuries.  The surgeon who
operated on Deputy Tatsch testified that he would have died without the
surgery.  Appellant was treated for his
injuries at the scene and then taken into custody.

After the incident was over, the deputies and
Sergeant White were separated, and detectives from the Fort Worth Police
Department interviewed each of them independently.  The police department conducted criminal and
administrative investigations but did not file charges against any of the
officers from the sheriff=s department.

B.  Trial proceedings








A grand jury indicted appellant for attempted
capital murder and two counts of aggravated assault.  Appellant pled not guilty at the outset of
his trial.  During cross-examination, appellant=s
counsel asked Sergeant White questions about the investigation following the
incident.  Appellant asked whether
Sergeant White had an attorney present when he gave his statement to Detective
Jamison, a detective for the major case unit of the Fort Worth Police
Department.  After Sergeant White
admitted that a CLEET attorney was present, appellant asked Sergeant White if
he knew about his Garrity rights.[4]  The prosecutor objected to the question on
relevance grounds.  After hearing
arguments on the issue, the trial court sustained the objection; appellant made
a bill for appellate review.  During the
questioning under the bill, Sergeant White testified that he did not invoke his
Garrity rights.  Appellant
attempted to impeach this claim by showing that before his interview with
Detective Jamison, Sergeant White read a card provided by the attorney, who was
present during the interview, that stated he reserved his right to remain
silent under the Fifth and Fourteenth Amendments and that Athis is Garrity.@  But Sergeant White testified that he did not
think this meant he invoked his Garrity rights because he gave a
statement anyway.








The State also called Katrina Smith as a
witness.  Smith dated appellant before
the incident, but continued to stay in contact with appellant after their
relationship ended.  Smith testified that
appellant called her at 7:00 a.m. on the morning of the shooting and they had
talked.  Smith also testified that at
some point that same morning, she had listened to a voicemail message from
appellant in which he asked if she had sent the police to his apartment.  But Smith testified that when she and
appellant talked that morning, they did not discuss the police at all.  The State asked Smith if she recalled
statements that she had made to the police detective about the phone
conversation she had with appellant. 
Appellant objected to the question and requested a limiting instruction
to Smith=s
anticipated answer because appellant believed the prosecutor was attempting to
impeach Smith by using a prior inconsistent statement.  At this time, appellant submitted a limiting
instruction to the trial judge, who read parts of the instruction to the jury
before the questioning resumed.  The trial
judge admonished the jurors that impeachment testimony should be used to assess
credibility.  The judge declined to
instruct the jury, as appellant requested, that impeachment testimony cannot be
used to determine guilt or innocence and can only be used to assess
credibility.








As part of the prosecutor=s
efforts to impeach Smith, the State also asked her about other prior
inconsistent statements she made to the prosecutor.  Appellant requested that the trial court
provide another limiting instruction to apply to prior statements made to the
prosecutor.  The trial court instructed
the jury that the previous limiting instruction again applied and should be
used to assess Smith=s credibility.  The trial court again declined to instruct
the jury that impeachment testimony only applies to credibility and cannot be
used to determine guilt or innocence.

Later, still on direct, Smith testified that she
recalled appellant indicating to her at least a couple of days before the
offense that he wanted to die and that he would not be seeing her anymore.  The State also asked if appellant sounded
serious when he told Smith those things. 
Appellant objected, and at a bench conference, the State urged Athat
this was a suicide by cop and that he was not coming out and he is calling and
saying his good-byes.  So this goes to
his mental state.@ 
But the trial court sustained appellant=s
objection.  Even though the jury did not
hear Smith=s answer, one of the prosecutors
briefly referred to the Asuicide by cop@ theory
in her closing.[5]








During the charge conference, appellant objected
to the trial court=s proposed charge on several
grounds.  One objection was that a
mistake of fact instruction should have been included in the self-defense
application paragraph.  Appellant argued
that the mistake of fact defense applies not only to the elements of the
charged offense, but also to the defense of self-defense, which is not
available when an actor knows a peace officer is effecting an arrest.  Appellant requested language stating that the
jury should find in his favor on the element of self-defense if he was mistaken
as to the identity of the peace officer. 
After argument, the trial court denied appellant=s
proposed instruction.

Appellant also objected to the trial court=s
instruction that Smith=s impeachment testimony could be
considered for credibility purposes Aand for
no other reason.@ 
Appellant requested that the charge further instruct the jury that they
could not consider the impeachment testimony for purposes of determining guilt
or innocence.  The trial court denied the
proposed instruction.

The jury returned a verdict of guilty on the
charge of attempted capital murder and assessed punishment at sixty years=
confinement.  The trial court imposed a
sentence in accordance with the verdict. 
Appellant timely filed his notice of appeal.

III.  The
Right to Confrontation and the Right to Expose a Witness=s Bias

In his first two points, appellant challenges the
trial court=s decision to limit the
cross-examination of Sergeant White as a violation of the Confrontation Clause
and Texas Rule of Evidence 613(b).  We
consider both points together because the legal issues are intertwined.








A.  Standard of review

We review a Atrial
court=s
decision to limit cross‑examination of a witness regarding credibility@ for an
abuse of discretion.  Pope v. State,
161 S.W.3d 114, 123 (Tex. App.CFort
Worth 2004), aff'd, 207 S.W.3d 352 (Tex. Crim. App. 2006), cert.
denied, 549 U.S. 1350 (2007).  A
court abuses its discretion when its decision goes beyond the Azone of
reasonable disagreement.@ 
Green v. State, 934 S.W.2d 92, 101B02 (Tex.
Crim. App. 1996), cert. denied, 520 U.S. 1200 (1997).

B.  Applicable law

The Confrontation Clause protects the right of an
accused to confront any witnesses that are against him.  U.S. Const. amend. VI; Lopez v. State,
18 S.W.3d 220, 222 (Tex. Crim. App. 2000).

Confrontation means more
than being allowed to confront the witness physically.  A primary interest secured by the
Confrontation Clause is the right of cross‑examination.  Each Confrontation Clause issue must be
weighed on a case‑by‑case basis, carefully taking into account the
defendant=s right to cross‑examine
and the risk factors associated with admission of the evidence.  In weighing whether evidence must be admitted
under the Confrontation Clause, the trial court should balance the probative
value of the evidence sought to be introduced against the risk its admission
may entail.

 

Lopez, 18 S.W.3d at 222 (footnotes omitted).













Exposing a witness=s motivation
or bias in testifying is one of the foundational purposes of the Confrontation
Clause and the right to cross-examination. 
Davis v. Alaska, 415 U.S. 308, 316B17, 94
S. Ct. 1105, 1110 (1974).  Defendants
have the right to inquire into any area reasonably calculated to reveal a
witness=s
motives, biases, and interests in testifying. 
Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996)
(citing Lewis v. State, 815 S.W.2d 560, 565 (Tex. Crim. App. 1991), cert.
denied, 503 U.S. 920 (1992)).  As
part of the right to confrontation, the defendant may seek to impeach or
discredit a witness.  Pope, 161
S.W.3d at 124 (AThis includes impeaching the
witness with relevant evidence that might reflect bias, interest, prejudice,
inconsistent statements, traits of character affecting credibility, or evidence
that might go to any impairment or disability affecting the witness=s
credibility.@ (citing Davis, 415 U.S.
at 316, 94 S. Ct. at 1110)).  A result of
the Confrontation Clause is that a defendant=s right Ato cross‑examine
a . . . witness extends to any matter that could reflect on the witness=s
credibility.@ 
Id. (citing Virts v. State, 739 S.W.2d 25, 28B29 (Tex.
Crim. App. 1987)).  Thus, the trial court
should give the defendant great latitude to reveal any relevant facts that
reflect on the credibility of the witness. 
Id.  For purposes of
witness credibility, Athe test of relevancy is not
whether the answer sought will expound any of the main issues, but whether it
will aid the court or jury in appraising the credibility of the witness and
assessing the probative value of the direct testimony.@  McDaniel v. State, 3 S.W.3d 176, 180
(Tex. App.CFort Worth 1999, pet. ref=d).

The Court of Criminal Appeals recently held that

[t]he possible animus,
motive, or ill will of a prosecution witness who testifies against the
defendant is never a collateral or irrelevant inquiry, and the defendant is
entitled, subject to reasonable restrictions, to show any relevant fact that
might tend to establish ill feeling, bias, motive, interest, or animus on the
part of any witness testifying against him.

 

Billodeau v. State, 277 S.W.3d 34, 42B43 (Tex.
Crim. App. 2009) (citing London v. State, 739 S.W.2d 842, 846 (Tex.
Crim. App. 1987)).  Billodeau,
however, does not hold that a defendant can explore every possible line of
inquiry.  A[T]he
Confrontation Clause guarantees an opportunity for effective cross‑examination,
not cross‑examination that is effective in whatever way, and to whatever
extent, the defense might wish.@  Delaware v. Fensterer, 474
U.S. 15, 20, 106 S. Ct. 292, 294 (1985). 
The Supreme Court of the United States has stated that the right to
cross‑examine a witness is not without limits:








It does not follow,
[however], that the Confrontation Clause of the Sixth Amendment prevents a
trial judge from imposing any limits on defense counsel=s inquiry into the
potential bias of a prosecution witness. 
On the contrary, trial judges retain wide latitude insofar as the
Confrontation Clause is concerned to impose reasonable limits on such cross‑examination
based on concerns about, among other things, harassment, prejudice, confusion
of the issues, the witness= safety, or interrogation that is repetitive or
only marginally relevant.

 

Delaware v. Van Arsdall, 475
U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986); see Lopez, 18 S.W.3d at 222
(AThe
trial court maintains broad discretion to impose reasonable limits on cross‑examination
to avoid harassment, prejudice, confusion of the issues, endangering the
witness, and the injection of cumulative or collateral evidence.@); Felan
v. State, 44 S.W.3d 249, 254 (Tex. App.CFort
Worth 2001, pet. ref=d) (AThe
court may properly limit the scope of cross-examination to avoid harassment,
prejudice, confusion of the issues, endangering the witness, and the injection
of cumulative or collateral evidence.@ (citing
Lagrone v. State, 942 S.W.2d 603, 613 (Tex. Crim. App.), cert. denied,
522 U.S. 917 (1997)); Garza v. State, 18 S.W.3d 813, 821 (Tex. App.CFort
Worth 2000, pet. ref=d)).








Confusion of the issues Arefers
to a tendency to confuse or distract the jury from the main issue of the case.@  Gigliobianca v. State, 210 S.W.3d 637,
641 (Tex. Crim. App. 2006).  Unless the
inquiry on cross‑examination is addressing an issue that relates to the
charged offense or the credibility of the witness, Aallowing
a party to delve into the issue beyond the limits of cross‑examination
wastes time and confuses the issue.@  Hayden v. State, No. PD‑0860‑07,
2009 WL 928569, at *4 (Tex. Crim. App. Apr. 8, 2009).  Accordingly, a trial court abuses its discretion
when it denies a defendant the opportunity Ato show
a prototypical form of bias on the part of the witness@ through
cross-examination.  Felan, 44
S.W.3d at 254 (citing Lagrone, 942 S.W.2d at 613).

C.  Analysis








At trial, Appellant attempted to cross‑examine
Sergeant White about having an attorney present during the Fort Worth Police
Department=s investigation following the
shooting.  Appellant hoped to demonstrate
that Sergeant White invoked his Garrity rights.  The Garrity doctrine protects an
officer who is required to make incriminating statements as part of an
investigation by excluding the officer=s
statements from use in a future prosecution. 
Appellant believed that Sergeant White=s
invocation of his Garrity rights during the investigative interview
indicated that Sergeant White knew he had engaged in wrongdoing and, therefore,
that he had a bias and a motive to testify untruthfully.  See Garrity, 385 U.S. at 500, 87 S.
Ct. at 620.  Although the trial court
sustained the State=s relevancy objection and
prevented appellant from inquiring into whether Sergeant White invoked his Garrity
rights, it did not prevent appellant from questioning Sergeant White about
any potential bias or improper motive; the court precluded appellant from
questioning Sergeant White only about a very narrow issue.  Appellant was still permitted to demonstrate
that Sergeant White had an attorney present during his interview, to bring to
light the fact that there was an investigation by the Fort Worth Police
Department, and to emphasize the difference in testimony between Sergeant White
and the other deputies.[6]








A trial court has the discretion to limit
testimony that may confuse the issues or be only marginally relevant.  Van Arsdall, 475 U.S. at 679, 106 S.
Ct. at 1435; Felan, 44 S.W.3d at 254 (citing Lagrone, 942 S.W.2d
at 613).  Whether Sergeant White may have
invoked his Garrity rights is only a marginally relevant issue and does
not necessarily indicate that he had a reason to provide false testimony.  Rather, Sergeant White=s
possible invocation of Garrity would more likely indicate an intent to
testify truthfullyCeven if that testimony could
potentially implicate him in wrongdoingCbecause Garrity
protects an officer from the future use of an incriminating statement.  See Garrity, 385 U.S. at 500, 87 S. Ct.
at 620.  Because Sergeant White=s
testimony regarding Garrity would have been only marginally relevant and
potentially confusing, we conclude and hold that the trial court=s ruling
is not beyond the zone of reasonable disagreement and, thus, that the trial
court did not abuse its discretion by excluding the line of questioning.  We overrule appellant=s first
two points.

IV.  Jury
Instructions

In his third point, appellant contends that the
trial court failed to properly instruct the jury because it did not include a
mistake of fact defense instruction in the application paragraph of the
self-defense instruction to the jury.  In
his fourth point, appellant challenges the efficacy of the limiting
instructions given during the trial and provided in the jury charge.

A.  Standard of review








Appellate review of error in a jury charge or
instruction to the jury involves a two‑step process.  Abdnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994).  Initially, we
must determine whether error occurred. 
If so, we must then evaluate whether sufficient harm resulted from the
error to require reversal.  Id. at
731B32.  Error in the charge, if timely objected to in
the trial court, requires reversal if the error was Acalculated
to injure the rights of [the] defendant,@ which
means no more than that there must be some harm to the accused from the
error.  Tex. Code Crim. Proc. Ann. art.
36.19 (Vernon 2007); Abdnor, 871 S.W.2d at 731B32; Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh=g); see
also Minor v. State, 91 S.W.3d 824, 827B29 (Tex.
App.CFort
Worth 2002, pet. ref=d) (applying analysis).  In other words, a properly preserved error
will require reversal as long as the error is not harmless.  Almanza, 686 S.W.2d at 171.  In making this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Id.; see also Ovalle v. State,
13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

B.  Mistake of Fact and
Self-Defense

1. 
Applicable law








A trial court does not commit error when the jury
charge accurately states the law.  Taylor
v. State, 148 S.W.3d 592, 595 (Tex. App.CFort
Worth 2004, pet. ref=d).  A defendant Ahas the
right to an instruction on any defensive issue raised by the evidence, whether
such evidence is strong or weak, unimpeached or contradicted, and regardless of
what the trial court may or may not think about the credibility of this
evidence.@ 
Miller v. State, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991); Bell
v. State, 169 S.W.3d 384, 394B95 (Tex.
App.CFort
Worth 2005, pet. ref=d).  When the defendant raises the issue of
mistaken belief at trial, Ahe is
entitled to a defensive instruction of >mistake
of fact.=@  Miller,  815 S.W.2d at 585.  A defendant also has a right to an
instruction on self-defense when he raises that issue at trial.  Id.

2. 
Analysis

The Texas Penal Code provides in part: A[A]
person is justified in using force against another when and to the degree the
actor reasonably believes the force is immediately necessary to protect the
actor against the other=s use or attempted use of
unlawful force.@ 
Tex. Penal Code Ann. ' 9.31(a)
(Vernon Supp. 2009).  Furthermore, A[t]he
use of force against another is not justified: to resist an arrest
. . . that the actor knows is being made by a peace officer.@  Id. '
9.31(b)(2).  A>Reasonable
belief= means a
belief that would be held by an ordinary and prudent man in the same
circumstances as the actor.@  Id. ' 1.07(a)(42)
(Vernon Supp. 2009).


















Because there was evidence at trial suggesting
that appellant acted in self‑defense and that appellant had a mistaken
belief as to the identity of the deputies who forcibly entered his apartment,
appellant was entitled to have an instruction on these defenses.  See Miller, 815 S.W.2d at 585.  Accordingly, the trial court provided
instructions to the jury about self‑defense and mistake of fact.[7]  The trial court=s
definition of Areasonable belief@tracked
the statutory language verbatim.  See
Tex. Penal Code Ann. ' 1.07(a)(42).  Similarly, the trial court=s
definitions of self‑defense and mistake of fact are virtually identical
to those in the statute.  See id. ''
8.02(a), 9.31(a), (b)(2).  While not
included in the self-defense specific paragraph, the mistake of fact
instruction was included in the general application paragraph.








Appellant=s
requested instruction required the jury to find that his use of force was not
for the purpose of resisting an arrest he knew was being made by a peace
officer if the jury had reasonable doubt as to whether appellant was mistaken
about Deputy Tatsch=s identity as a peace
officer.  Such an instruction was not
necessary, however.  The State had the
burden of proving its own case beyond a reasonable doubt, which necessarily
required the State to convince the jury that appellant=s
account of the event was incorrect.  See
Zuliani v. State, 97 S.W.3d 589, 594B95 (Tex.
Crim. App. 2003); Dotson v. State, 146 S.W.3d 285, 291 (Tex. App.CFort
Worth 2004, pet. ref=d).  If the jury had believed that appellant
mistakenly thought Deputy Tatsch was not a peace officerCand thus
found him not guilty of the charged offenses as instructed by the trial courtCit would
not have been necessary for the jury to also then determine whether
self-defense applied; the result would have been the same:  an acquittal of the charged offenses.  See Allen v. State, 253 S.W.3d 260,
263  (Tex. Crim. App. 2008).  And it would likewise not have been necessary
to so instruct the jury with respect to the charged lesser-included offenses of
attempted murder, aggravated assault, and deadly conduct because, according to
the charge, the jury was not to consider those offenses unless it had
previously found that appellant did not know Deputy Tatsch was a peace officer;
thus, according to the charge as written, the jury would still have been able
to consider self-defense as to the lesser-included charges.  Moreover, even if the refusal to include
appellant=s requested charge were error,
it would be harmless because the jury obviously disbelieved appellant=s
testimony that he did not know Deputy Tatsch was a peace officer.  See Montgomery v. State, 198 S.W.3d
67, 94 (Tex. App.CFort Worth 2006, pet. ref=d).  Because the charge as a whole correctly
instructed the jury, we hold that the trial court did not err.  We overrule appellant=s third
point.

C.  Limiting Instructions on
Impeachment Testimony








In his fourth point, appellant challenges the
trial court=s denial of his proposed
limiting instruction during trial and in the jury charge.  Appellant asserts that the trial court, while
providing a limiting instruction when it was requested, did not provide a
complete limiting instruction as to Smith=s
testimony.  Appellant claims, and the
dissent agrees, that because the jury was not specifically told to ignore the
impeachment testimony for purposes of guilt-innocence, the jury could have
convicted appellant by improperly considering the impeachment testimony.

1. 
Applicable law








Rule of evidence 105(a) provides that A[w]hen
evidence which is admissible as to one party or for one purpose but not
admissible as to another party or for another purpose is admitted, the court,
upon request, shall restrict the evidence to its proper scope and instruct the
jury accordingly.@ 
Tex. R. Evid. 105(a).  Limiting
instructions are most effective when they are simultaneously provided with the
related evidence.  Rankin v. State,
974 S.W.2d 707, 712 (Tex. Crim. App. 1996). 
Thus, when evidence is admitted for a limited purpose, the trial court
must, upon request, provide a midtrial limiting instruction.  Id.; King v. State, 189 S.W.3d
347, 356 (Tex. App.CFort Worth 2006, no pet.); see
Tex. R. Evid. 105(a).  This is so
because failing to provide the instruction may improperly result in the jury
forming a negative inference about the defendant.  Jackson v. State, 992 S.W.2d 469, 477
(Tex. Crim. App. 1999).  And this
improper inference, once formed, cannot easily be cured by an instruction in
the jury charge.  Id.  When a defendant properly requests a
limiting instruction, trial courts should not have the discretion to provide
the instruction at a less opportune time. 
Rankin, 974 S.W.2d at 712. 
If the defendant fails to request a limiting instruction at the
introduction of the impeachment evidence, then the defendant does not preserve
error and the trial court is not required to provide an instruction; the burden
is on the defendant alone to request a limiting instruction.  Martin v. State, 176 S.W.3d  887, 899 (Tex. App.CFort
Worth 2005, no pet.); Cole v. State, 46 S.W.3d 427, 432 (Tex. App.CFort
Worth 2001, pet. ref=d).








The Court of Criminal Appeals has long held as an
established principle of law that when Ait is
necessary to charge in regard to the effect of impeaching testimony, the jury
should be told that the evidence must be used for the purpose of affecting the
credibility of the witness whose evidence is sought to be impeached.@  Pratt v. State, 50 Tex. Crim. 227,
230, 96 S.W. 8, 10 (1906); see Gentry v. State, 68 Tex. Crim.
567, 571, 152 S.W. 635, 637 (1912) (holding a limiting instruction sufficient
that admonished the jury not to consider impeachment testimony as evidence
against the accused, but only as evidence of the credibility of the witness); Edmondson
v. State, 68 Tex. Crim. 113, 115, 150 S.W. 917, 918 (1912) (AWhe[n]ever
impeaching testimony is admitted, it must be restricted by the court to the
purpose for which it was admitted. If it was for the purpose of affecting his
credibility as a witness before the jury, that body must be instructed clearly
that such is the purpose for which the evidence was introduced.@); Hunter
v. State, 59 Tex. Crim. 439, 455, 129 S.W. 125, 134  (1910).

In evaluating jury instructions, both oral and
written, juries are Apresumed to follow the trial
court=s
instructions in the manner presented.@  Kirk v. State, 199 S.W.3d 467, 479
(Tex. App.CFort Worth 2006, pet. ref=d); see
Young v. State, 283 S.W.3d 854, 882 (Tex. Crim. App. 2009) (Cochran, J.,
concurring) (AWe must, however, >presume[]
that jurors, conscious of the gravity of their tasks, attend closely [to] the
particular language of the trial court=s
instruction[s] in criminal cases and strive to understand, make sense of, and
follow the instructions given them.=@
(quoting Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S. Ct. 1965,
1976 n.9 (1985)); Williams v. State, 937 S.W.2d 479, 490 (Tex. Crim.
App. 1996).  Courts will abandon this
presumption only if there is evidence showing that the jury did not follow the
instructions.  Williams, 937
S.W.2d at 490.

2. 
Analysis

On direct, the State sought to impeach Smith by
showing that she made inconsistent statements to Detective Jamison after the
shooting.  Upon appellant=s
objection, the trial court provided the following limiting instruction to the
jury in court prior to Smith=s
answering any impeachment questions:








You may use [impeachment
testimony] to aid you, if it does aid you, in determining the credibility of
the witness who is testifying.  That=s the purpose of
impeaching testimony.  And so your
consideration of any different statements made outside of court is for the
purpose of determining the credibility of the witness.

 

The trial court refused appellant=s
request for additional language in the in-court instruction admonishing the
jury that it could not consider the impeachment testimony for purposes of the
guilt-innocence determination.  The trial
court provided the same in-court instruction when the State sought to impeach
Smith concerning prior statements made to the prosecutor.  Furthermore, the court=s jury
charge included the following:

You
are instructed that the credibility of a witness may be impeached by showing
that he has made other and different statements out of court from those made in
court during the trial. . . . 
You are instructed that such testimony may be considered by you
in determining, if it does so, the credibility and weight to be given to the
testimony of the witness, Katrina Smith, and for no other reason.  [Emphasis added.]

 

Appellant does not assert that
he was denied a timely limiting instruction; rather, he asserts that the trial
court=s
limiting instructionsCboth during trial and in the
chargeCwere
incomplete or inadequate.  Appellant
contends that the court only directed the jury to a permissible use of
impeachment testimony rather than restricting the jury=s use of
that evidence to its only proper purpose.








Our analysis is guided by two principles that
apply to jury instructions.  First,
courts cannot expect jurors Ato know
exactly how to use the evidence unless [the courts] tell them.@  Rankin, 974 S.W.2d at 712.  Second, juries are Apresumed
to follow the trial court=s instructions in the manner
presented.@ 
Kirk, 199 S.W.3d at 479. 
Without these two principles, our jury system would prove inoperable;
every jury verdict could be subject to its own trial about whether each juror
followed every instruction in every instance.

a. 
Limiting instruction in the jury charge








A trial court must provide a limiting instruction
that Arestrict[s]
the evidence to its proper scope.@  Tex. R. Evid. 105(a).  While it is not necessary for the court to
instruct the jury about the myriad of potential impermissible uses of limited
purpose evidence, the court must, nonetheless, restrict the scope so that the
evidence is considered only for its limited purpose.[8]  See, e.g., Pratt, 50
Tex. Crim. at 230, 96 S.W. at 10.  The
limiting instruction in the jury charge specifically instructed the jury what
Smith=s
impeachment testimony could be used forCto
determine the credibility of Smith as a witness.  The trial court then restricted the scope of
that evidence by further instructing that it could be used Afor no
other reason.@  [Emphasis added.]  Thus, this jury charge instruction properly
restricted the scope of the jury=s use of
the impeachment testimony so that the jury would not improperly consider Smith=s
inconsistent statements in its deliberations. 
See Prescott v. State, 744 S.W.2d 128, 133 & n.5 (Tex. Crim.
App. 1988) (AMoreover, the [incomplete]
limiting instruction given in the charge to the jury did not limit the use of
the appellant=s prior felony conviction to
impeachment only.@ (emphasis added)).  The trial court was not required to further
instruct the jury that it could not consider the impeachment testimony for
purposes of determining guilt-innocence because that idea is implicit in the
court=s
instruction that the impeachment testimony was to be used to determine
credibility and Afor no other reason.@  [Emphasis added.] We hold that there was no
error in the limiting instruction provided in the jury charge, and we overrule
this portion of appellant=s fourth point.








b. 
In-court limiting instruction

Appellant also asserts that the trial court erred
in its in-court limiting instruction when Smith=s
inconsistent statements were introduced. 
The trial court=s instruction properly told the
jury to consider Smith=s inconsistent statements for
credibility purposes.  While this is a
correct statement of the applicable law, the instruction is nevertheless
incomplete because the trial court failed to provide any kind of restriction on
the jury=s use of
the impeachment evidence as it ultimately did with its written jury charge instruction.  See Tex. R. Evid. 105(a).  In other words, the trial court=s
in-court instruction, unlike the jury charge instruction, instructed the jury
about what it could consider impeachment testimony for, rather than instructing
the jury that it could only consider impeachment testimony for one
purpose.  Cf. Tex. Gov=t Code
Ann. ' 311.016(1)
(Vernon 2005) (providing that, generally, in statutory construction, Amay@ creates
discretionary authority or grants permission or power); see generally U.S.
v. Rodgers, 461 U.S. 677, 706, 103 S. Ct. 2132, 2149 (1983) (AThe word
>may= when
used in a statute, usually implies some degree of discretion.@).  Thus, although the instruction given did not
misstate the law, it failed to properly restrict the jury=s use of
Smith=s
impeachment testimony and thus constituted error.








Having found error, we proceed to conduct a harm
analysis.  Abdnor, 871 S.W.2d at
731B32.  Because the trial court=s error
is nonconstitutional, we determine harm according to Texas Rule of Appellate
Procedure 44.2(b).  Tex. R. App. P.
44.2(b); Lemmons v. State, 75 S.W.3d 513, 524 (Tex. App.CSan
Antonio 2002, pet. ref=d); Rankin v. State, 995
S.W.2d 210, 215 (Tex. App.CHouston
[14th Dist.] 1999, pet. ref=d) (op.
on remand).  We will disregard any error
that does not affect a substantial right of the defendant.  Tex. R. App. P. 44.2(b).  A substantial right is affected when the
error had a substantial and injurious effect or influence in determining the
jury=s
verdict.  King v. State, 953
S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States,
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall, 961 S.W.2d
at 643.  Conversely, an error does not
affect a substantial right if we have Afair
assurance that the error did not influence the jury, or had but a slight
effect.@  Solomon v. State, 49 S.W.3d 356, 365
(Tex. Crim. App. 2001); Johnson v. State, 967 S.W.2d 410, 417 (Tex.
Crim. App. 1998).








In making this determination, we review the
record as a whole, including any testimony or physical evidence admitted for
the jury=s consideration,
the nature of the evidence supporting the verdict, and the character of the
alleged error and how it might be considered in connection with other evidence
in the case.  Motilla v. State, 78
S.W.3d 352, 355 (Tex. Crim. App. 2002).

The trial court=s
in-court instruction informed the jury that it could consider Smith=s
impeachment testimony for credibility purposes. 
Thus, even though the instruction was incomplete, the trial court did
provide at least some guidance to the jury on the proper use of Smith=s
impeachment testimony.  Although there is
some indication that the jury was initially confused about how it could use the
impeachment testimonyCas evidenced by a note given to
the judge during a break in the trialCthat
confusion nevertheless indicates that the jury realized there could be some
kind of limitation on the purpose for which it could consider the
testimony.  Furthermore, the trial court
clarified and corrected the instruction in the jury charge.  Therefore, unlike the situation in which the
trial court fails to give any midtrial limiting instruction, here, whatever
misconceptions the jury may have had would likely have been corrected by this
proper limiting instruction.  Also,
because the trial court provided the correct instruction to the jury
immediately before it began deliberating, it would likely have been more
influential in the jury=s deliberations.  Likewise, there is no indication that the
jury had trouble following the proper instruction as given in the charge.  See Lemmons, 75 S.W.3d at 525; Rankin,
995 S.W.2d at 215.








The dissent focuses on the State=s
apparent confusion about the significance of Smith=s
testimony.  It does appear that the State
attempted to rely on part of Smith=s
testimony as truthful in advancing the Asuicide
by cop@ theory
even after introducing her prior inconsistent statements, apparently in an
attempt to impeach Smith=s overall credibility as a
witness.  See, e.g., Del Carmen
Hernandez v. State, 273 S.W.3d 685, 689 (Tex. Crim. App. 2008) (AThe
theory of attack by prior inconsistent statements is not based on the
assumption that the present testimony is false and the former statement true
but rather upon the notion that talking one way on the stand and another way
previously is blowing hot and cold, and raises a doubt as to the truthfulness
of both statements.@); Lopez v. State, 643
S.W.2d 431, 435 (Tex. App.CCorpus
Christi 1982, no pet.) (AImpeachment is the introduction
of prior inconsistent statements . . . to discredit a witness.@).  But, despite that apparent confusion, the
State did not later impermissibly argue that the content of Smith=s prior
inconsistent statements proved that appellant knew the deputies entering the
apartment were peace officers, which was the crux of the disputed issues at
trial.








Moreover, the State did not spend any significant
time advancing the Asuicide by cop@
theory.  There was considerable
circumstantial evidence contradicting appellant=s
testimony that he did not know the deputies were peace officers.  It was the discrepancies between appellant=s
testimony and the officers=
testimony that the prosecutors primarily relied on in their closing arguments.[9]








For instance, Deputy Tatsch testified that the
sheriff=s
department had been looking for appellant for over six months and had let
people know that they were looking for him; several times they missed
apprehending appellant by only a short period of time.[10]  When the deputies went to the apartment on
the morning of September 12, 2003, they were dressed in dark clothing that had
sheriff=s
department markings on the sleeves; they were also wearing gun belts, and
Sergeant White was wearing a radio on his shoulder.  Three deputies testified unequivocally that
they saw the blinds being parted as if by a person looking out the window.[11]  The officers knocked on the door and
announced their presence and purpose for at least forty-five minutes to an
hour before entering; Cross, the maintenance technician, testified that
some of the knocks were loud enough to make the patio glass door shake.[12]  Deputy Pickle testified that he also knocked
on the window to the right of the patio door and said, ASheriff=s
department, felony warrant, go to the door.@

The officers then tried to open the lock with a
key from Cross (appellant failed to explain how the man with whom he and Joyce
had prior altercations would have acquired a key to the apartment)[13];
when they realized the door was bolted from the inside, they used a battering
ram to open it.  Deputy Tatsch testified
that the deputies again announced their presence and purpose after they had
entered the apartment.[14]  The front door of the small, one-bedroom
apartment was directly across from the bedroom door with approximately thirteen
to twenty feet separating the two.








Deputy Tatsch testified that before they entered
the apartment, they received confirmation by cell phone that appellant was
inside; he and Deputy Hernandez also testified that Williams was outside the
apartment immediately after the shooting, before the Fort Worth police had even
arrived.

In light of this overwhelmingly sufficient
evidence at trial showing that appellant knew that there were peace officers
outside his apartmentCand the jury=s
obvious rejection of appellant=s own
testimony[15]Cwe are
not convinced that the incomplete in-court limiting instruction, as modified by
the correct instruction in the jury charge, affected the fairness of appellant=s trial
or had any significant influence upon the jury=s
deliberations.  Therefore, considering
the record in its entirety, we conclude and hold that the trial court=s error
was harmless.  Tex. R. App. P. 44.2(b); Lemmons,
75 S.W.3d at 525; Rankin, 995 S.W.2d at 215; see Motilla, 78
S.W.3d at 355.  We overrule the remainder
of appellant=s fourth point.








V. 
Conclusion

Having overruled all of appellant=s
points, we affirm the trial court=s
judgment.

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT, and MEIER, JJ.

 

DAUPHINOT, J., filed a
dissenting opinion.

 

PUBLISH

 

DELIVERED:  October 1, 2009











 
 
 
 
 
 
 




 

 

 

 

 

 

                                               COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-07-272-CR

 

 

KOREY
DEMAINE WALKER                                                    APPELLANT

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL DISTRICT
COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                   DISSENTING OPINION

 

                                              ------------

I would hold that the erroneous contemporaneous
limiting instruction regarding the prior statements of witness Katrina Smith
was harmful and remand this case for a new trial; I therefore dissent from the
majority=s conclusion
that the error was harmless.








Rule 105(a) of the Texas Rules of Evidence
provides that A[w]hen evidence . . .
admissible for one purpose but not . . . for another purpose is
admitted, the [trial] court, upon request, shall restrict the evidence to its
proper scope and instruct the jury accordingly.@[1]  Restrict is defined as A[t]o
restrain within bounds; to limit; to confine@[2] and Ato set
bounds or limits to.@[3] 
Further, as the Texas Court of Criminal Appeals explained in Rankin,








The language of Rule 105(a) does not address the temporal aspect of
when limiting instructions should be given, but, rather, sets out the
circumstances under which an instruction must be given.  However, . . . we assume that the
spirit of the rule and the contemplation of the rule‑makers includes two
separate notions:  First, that limiting
instructions actually curb the improper use of evidence and, second, that the
rule should act in a way that not only Arestrict[s] the evidence to its proper scope,@ but does so as
effectively as possible.  Working under
these notions, logic demands that the instruction be given at the first
opportunity.  If limiting instructions
impede the improper use of evidence, then an instruction given when the
evidence is admitted limits that evidence to its proper scope immediately.  An instruction given for the first time
during the jury charge necessarily leaves a window of time in which the jury
can contemplate the evidence in an inappropriate manner.  For example, . . . if the State
offered evidence to show that a defendant accused of child molestation had
previously molested two other young girls, then that evidence may properly be
considered to show intent to molest the complainant.  However, jurors may also improperly use that
evidence to form a negative opinion of the defendant prior to receiving
limiting instructions from the judge. 
Jurors cannot be expected to know exactly how to use the evidence unless
we tell them, nor can we guarantee that they will Aremain open‑minded
until the presentation of all of the evidence and instructions . . .
.@  Additionally, we cannot tell how jurors have
used the admitted evidence.  Thus, the
possibility exists that, unless we instruct the jury on evidence concurrently
with its admittance, jurors may, unbeknownst to us, use that evidence improperly
by forming an indelible perception of the defendant that will work unfairly to
his inevitable detriment.

 

. . . .

 

Limiting instructions given for the first time during the jury charge
thus do not constitute an efficacious application of Rule 105(a) since it
allows for the possibility that evidence will be used improperly in clear
contravention to the purpose of the rule. 
Since limiting instructions operate most effectively when given
simultaneously with the relevant evidence, it would not do to grant trial
courts Adiscretion@ to deliver those
instructions, after they had been properly requested, at a less opportune time.[4]

 

In Hammock, the Texas Court of Criminal Appeals reiterated,

Passage of time and
accumulation of other evidence make[s] it hard to accomplish the intended
purpose (of a limited instruction) at the end of the case.  If the jury is required to consider evidence
in a limited manner, then it must do so from the moment the evidence is
admitted.  Allowing the jury to consider
evidence for all purposes and then telling them to consider that same evidence
for a limited purpose only is asking a jury to do the impossible.  If a limited instruction is to be given, it
must be when the evidence is admitted to be effective.[5]

 








The record shows that the trial court=s
contemporaneous instruction informed the jury that they could consider the
prior evidence in assessing Katrina=s
credibility but did not communicate to them the limits or bounds of their
consideration; that is, the contemporaneous instruction did not inform the jury
members of what they could not doCtreat
the evidence as substantive evidence of Appellant=s guilt.

After the trial court gave the erroneous
contemporaneous instruction, Katrina answered in response to the State=s
questions about her conversations with Appellant on the morning of the offense
that she did not recall telling Detective Jamison that Appellant had indicated
that the police were outside his house, that she did not remember Appellant
saying that he was going to jail, that she did not recall Appellant saying that
he knew he was going to jail because the police were outside, that she did not
recall Appellant saying that he did not know why the police were out there, and
that she did not remember calling Appellant three or four times or telling the
prosecutor that she had tried to call Appellant back about four times after the
telephone went dead during their conversation. 
In response to the State=s
question, ADo you recall speaking to
[Appellant] and him indicating he wished he would die?@,
Katrina answered, AI recall that.@  She also confirmed that Appellant had told
her that he was not going to see her anymore and that she had taken him
seriously.








The jury demonstrated its confusion regarding the
erroneous contemporaneous instruction on the same day that they received
it.  At a break, one of the jurors gave
the bailiff a note for the judge that said, AJudge,
could you please explain impeachment of a witness.  We are not sure what you meant.@

Like the jury, the State demonstrated its
confusion concerning any limitations regarding the use of Katrina's testimony
when the prosecutor argued to the court, AWe
submit that this was a suicide by cop and that he was not coming out and he is
calling and saying his good-byes.  So
this goes to his mental state.@  Additionally, in the State=s final
closing argument, the prosecutor argued, AThis man
[Appellant] is responsible for what happened that day.  He decided it was suicide by cop.  That=s how he
was going to go out, shooting it out with the police.@  The State, then, used Katrina=s testimony
as evidence of guilt, not as evidence of her credibility or lack thereof, in
arguing both to the trial court and to the jury.








Appellant=s
defense at trial was that he did not know that the person or persons inside his
apartment were police officers until after the complainant Deputy Tatsch had
already been shot.  The deputies serving
the warrant testified at trial.  The State
went to great lengths to attempt to prove to the jury that all the deputies who
were part of the group serving the warrant that day wore uniforms and badges
and that they identified themselves and knocked loudly for a long period of
time, yelling and banging on the door for forty-five minutes to an hour, before
asking the apartment complex for a key. 
There was no suggestion in the record that anyone complained or even
noticed any noise. Deputy Hernandez admitted on cross-examination that a person
in an adjacent apartment was still asleep after the shooting was over and that
it took awhile to wake him up.

The apartment complex=s
maintenance worker, Jess Cross, who arrived to give the deputies a key to the
apartment, confirmed that from his vantage pointCthe
ground below the patio side of the apartmentChe heard
the deputies knocking loudly on the front door, loudly enough that it shook the
patio glass window, before they forced their way into the apartment by using
the battering ram to break the door and also confirmed that he heard them
speak.  But, contrary to Sergeant White=s
testimony, Cross testified that they knocked only twice after he arrived.








The State also solicited testimony about where
the deputies parked their marked cars in relation to the apartment.  Deputy Johnson testified that he parked in
front of the building that the apartment was in but that he did not believe
that he had parked directly in front of the apartment. He did not remember
where the other deputies had parked. 
Deputy Hernandez testified that the deputies had parked their cars in a
secured location to the left of the building. 
He also testified that they all initially parked away from the building
but that Deputy Pickle moved his car before the officers entered the apartment
to the patio side of the apartment, Aright
outside the window.@ 
Deputy Pickle testified that the deputies Aparked,
I believe it was twoCjust to the north, away from the
apartment@ and Adown a ways
a little bit and walked back up to the apartment@ so that
they could Abe undetected coming up.@  He also testified that he moved his vehicle
closer to the apartment, Aright in front of@ it, and
ten feet away when they were trying to contact maintenance.  He testified that he parked catty-cornered or
at an angle and could later see Athat
parking lot@ through the window of the
apartment when he was inside the apartment. 
Sergeant White testified that he Aparked
up against theCI think there=s a
covered parkway opposite another patrol unit that was parked in front of [the]
apartment.@ 
Detective Brian Jamison, who investigated the shooting, testified that
two sheriff=s department vehicles were
fairly close to the front of the apartment when he arrived at the scene after
the shooting.








Deputy Tatsch testified that the deputies parked Aa little
bit away,@ maybe forty yards, from the
apartment for Aofficer safety issues@; Anobody
wants to get shot trying to walk up to an apartment or tip off that we=re even
there.@  He also testified that they did not move
their vehicles and did not park in front of the apartment.  The maintenance worker, who was on the patio
side during the shooting, testified that he saw no sheriff=s
department units in the parking lot nearest the apartment=s front
door and did not testify that he saw any sheriff=s
department vehicles from his location.

The jury also heard evidence about blinds in the apartment.  According to Deputy Tatsch=s
testimony, before the entry, Deputy Pickle, stationed on the patio side of the
apartment, indicated that someone was looking out the blinds.  Deputy Pickle testified that he saw the
vertical blinds on the patio door Amove
like somebody had walked passed them, wind blown@ and
that about ten minutes later he saw someone looking at the deputies from the
window to the right of the patio door; that window was the bedroom window.  Deputy Pickle later clarified that he had not
actually been able to make out a person looking out the windows but instead had
seen movement, too high to be an animal, that suggested someone was looking out
the window or as if someone were looking out the window.  Unlike the patio door, the window to the
right of the patio, the bedroom window, had horizontal blinds.  He did not remember whether he saw movement
in the blinds on the living room windows located to the left of the patio.








Sergeant White testified that he was briefed that
Aan
individual had looked out the window several times through the blinds [and]
that someone had peeked out through the blinds@; he
claimed that the deputies had told him that that person was Appellant.  Corporal Varnon, the crime scene technician,
testified that he did not dust the blinds for fingerprints, nor did he have any
knowledge that anyone had dusted them for prints.  The maintenance worker testified that he did
not see any movement or anyone looking out the windows on the patio side of the
apartment and that if the air conditioner or fan was on, the vertical blinds
would move.

The jury also heard evidence about how the
shooting started.  The deputies=
testimony indicates that after they forcibly entered the apartment, Deputy
Tatsch announced again that they were deputies there to serve a felony warrant
and kicked a closed bedroom door.  Deputy
Johnston testified that the door flew open, he saw someone crouching or
kneeling near the bed in the dark bedroom, and he heard gunfire that to his
knowledge did not come from his gun or the gun of Deputy Tatsch.  He did not know if the door opened first or
he heard the gunfire first.  At almost
the same time as he heard the gunfire, Deputy Johnston testified, he saw that
the person in the bedroom had a gun in his hands.  He did not know if he heard the gunfire first
or saw the gun first.  He believed that
the gunfire he heard came from the bedroom and the vicinity of the gun he
saw.  Johnston did not know if the bedroom
door stayed open or closed.








Deputy Hernandez testified that Deputy Tatsch
kicked the door open, but Ait came
back closed somehow@ and stayed closed until
Appellant came out.  Deputy Hernandez did
not see anything during the brief period that the door was opened.  After the door closed, he heard gunfire and
paint from the bedroom door falling off. 
He believed that whoever was inside the room shot first and that he and
Deputies Tatsch and Johnston returned fire.

Sergeant White testified that the instant that
Deputy Tatsch kicked the bedroom door, Ashots
rang out from inside the bedroom@ and
that A[y]ou
could see the splinters coming out through the wall, the door.@

The maintenance worker who witnessed the shooting
from outside the apartment testified that the muzzle flash from the first shot
came from the living room, where the officers were.

After Deputy Tatsch was shot, the deputies
returned fire through the bedroom door. 
According to forensic evidence, seven shots went through the door
itself, from the living room into the bedroom. 
At some point soon after Deputy Tatsch announced that he had been hit,
Appellant came out of the bedroom holding a gun. Appellant surprised and
shocked Deputy Johnston by heading toward the front door.  Appellant moved within feet of Deputy
Johnston, they saw each other, and Deputy Johnston was afraid that Appellant
would shoot him. But Deputy Johnston testified that he did not see Appellant
point a gun at any of the officers after leaving the bedroom.








Deputy Hernandez testified that after he heard
Deputy Tatsch announce that he had been shot, he stepped back to the doorway of
the apartment to tell Deputy Pickle. 
When Deputy Hernandez turned back to the apartment, Appellant was coming
toward him, still carrying his gun, and Deputy Hernandez shot him.  Deputy Hernandez testified that Appellant did
not shoot anyone after exiting the bedroom but did point the gun, held in his
right hand, at Deputy Hernandez.  Deputy
Hernandez also seemed to admit, however, that Appellant could have just been
holding it that way naturally as he was attempting to walk or run out of the
apartment.  Deputy Hernandez=s
statement taken near the time of the incident may have provided that Appellant
had held the gun in his left hand, not his right.

Sergeant White testified that Appellant came out
of the bedroom firing his gun, that he pointed his gun at the deputies, and
that he continued firing until he was disabled.

According to the forensic testimony, however, all
three of the shell casings matching Appellant=s gun
were found in the same area in the bedroom, one of the bullets was in the door
facing, and one went through the door facing to lodge in the couch, indicating
that Appellant was standing in the bedroom when he fired all three shots.








Joyce Williams Walker, Appellant=s wife
at the time of trial and girlfriend at the time of the offense, testified that
she spoke with Appellant the morning of the shooting and that he told her that
someone was at the door of the apartment at which he was staying.  The apartment was leased by Joyce=s
brother=s
girlfriend, Crystal.  Appellant had his
own house.  Joyce told Appellant that she
would call Crystal because it was Crystal=s
apartment.  Instead, she spoke with her
brother, who took her to the scene of the shooting.

Detective Loughman of the Fort Worth Police
Department testified over defense objection that Joyce told him that Appellant
had called her that morning and had told her that the police were knocking at
the door, that she reported that she had told Appellant that he did not need to
answer the door because the apartment was not his residence, that she told the
detective that in a later phone conversation Appellant had told her that the
police had just shot the lock off of the door, that she told the detective that
she had advised Appellant to shoot at the police to protect himself, and that
she then told the detective that she had in fact not so advised Appellant.

Joyce denied telling the police that Appellant
had called her the morning of the shooting and had told her that the police
were at the door and denied telling the detective that she had told Appellant
that if the police came in, he should shoot them or anything to that effect.








Appellant testified that he did not know what
time he woke up on the morning of the offense, but that he was awakened by
something that sounded like it was brushing up against the outside wall of the
apartment.  He testified that he got up
and looked out the bedroom window and that he could only recall looking out once.  He did not see any police cars or sheriff=s cars
or any person.  He testified that he did
not tell Joyce that the police were at the door, that he did not know the
police were at the door, that he did not know that sheriff=s
deputies were at the door, and that he did not recall telling her that the
police had shot the lock off the door.

He admitted that he had left a phone message for
Katrina asking if she had sent the police, but he stated that he left it three
or four days after the shooting while he was still a patient at John Peter
Smith Hospital.  He admitted telling
Katrina that he was not going to see her anymore but denied saying that it was
because he was planning to kill himself and denied telling her that he wanted
to die.  Instead, he testified that he
had stopped wanting to be with her because she had indicated that she was going
to terminate her pregnancy.








Appellant testified that after his second
conversation with Joyce that morning, he heard what sounded to him like a very
loud gunshot.  He thought that Asomebody
had shot a gun, they came in and shot a gun and they were firing in the house.@  He thought that the person might have been
someone that he and Joyce had had prior altercations with or Aa number
of people.@ 
He did not believe that the person or persons he heard were sheriff=s
deputies.

Appellant testified that after hearing what he
thought was a shot, he dropped the phone, grabbed a pistol, and fired from his
bedroom.  He shot in the direction of his
closed bedroom door; he never saw it come open. 
He believed that there was nowhere to run and that he had no
alternative.  He could see return fire
coming through the walls; A[t]hey
were shooting through the walls, through the walls in the door.@

Appellant testified that he never heard anyone
pound on the door and say sheriff=s
office, arrest warrant, or anything similar, and that he never knew that
sheriff=s
deputies were outside his apartment until after the shooting.  Specifically, he testified that after the
shooting, it got totally quiet.  He
testified that he opened his bedroom door and went out, thinking that whoever
had come in the apartment had gone.  He
testified that he was running toward the front door when he saw the two sheriff=s
deputies in the kitchen and that he did not point his gun at any of the
deputies or try to shoot them.  He
further testified that he was not willing to commit a capital murder to avoid a
six-year sentence.








The issue of whether Appellant knew beyond a
reasonable doubt that the officers were officers before he shot was heavily
litigated by both parties throughout the trial. 
Some testimonial, physical, and forensic evidence before the jury
supports Appellant=s version of the events: all
three casings from the bullets shot from Appellant=s gun
were in the bedroom, bullet holes in the bedroom door and frame showed that at
least eight bullets shot into the bedroom and from the bedroom into the living
room were shot through a closed door, and the maintenance man testified that
the first shot was fired from the living room, not from the bedroom.  The evidence to the contrary was not
overwhelming.








In deciding that the erroneous contemporaneous
instruction was harmless, the majority relies on, among other things, the
limiting instruction in the jury charge, contending that it Awould
have . . . corrected@ any Amisconceptions
the jury may have had@ from the erroneous
contemporaneous instruction.  Yet the
prosecutor=s reliance on Katrina=s
testimony in the closing argument, after the prosecutor had already seen
the jury charge and after the trial judge had already read the jury
charge aloud in open court, belies the majority=s
contention and reaffirms the conclusion of the Texas Court of Criminal Appeals
that A[a]llowing
the jury to consider evidence for all purposes and then telling them to
consider that same evidence for a limited purpose only is asking a jury to do
the impossible.@[6]

Given the state of the evidence, Appellant=s theory
of the case, and the State=s
emphasis on the challenged testimony in furthering its Asuicide
by cop@ theory,
I believe that, in the context of the entire case against Appellant, the trial
court=s error
in refusing to contemporaneously instruct the jury that evidence of Katrina
Smith=s prior
statements was not admissible as substantive evidence to establish the truth of
the matter asserted and that they could not consider it as evidence of
Appellant=s guilt had a significant or
injurious effect on the jury=s
verdict such that Appellant=s
substantial rights were affected.[7]

I would therefore sustain Appellant=s fourth
point, not reach his remaining points, reverse the trial court=s
judgment, and remand this case for a new trial. 
Because the majority does not, I respectfully dissent.

 

LEE
ANN DAUPHINOT

JUSTICE

PUBLISH

 

DELIVERED:  October 1, 2009











[1]This was appellant=s second trial on the
same charge.  This court reversed
appellant=s original conviction for
error in the jury charge and remanded the case to the trial court for a new
trial.  See Walker v. State, No.
02-04-00491-CR, 2006 WL 908698 (Tex. App.CFort Worth April 6, 2006, pet. ref=d).





[2]Joyce Williams was
appellant=s girlfriend at the time
of the incident, but by the time of the trial, she was his wifeCJoyce Williams Walker.





[3]There was conflicting
testimony about when the first shot was fired. 
Sergeant White testified that the shot was fired immediately as the door
was kicked open.  Deputy Tatsch testified
that the shot was fired before the door closed. 
Deputy Hernandez testified that the first shot was fired through the
closed door.  Cross, the apartment
maintenance technician, testified that from his vantage point outside the
apartment, he saw a muzzle-flash from the living room area where the deputies
were that coincided with the first shot he heard. 





[4]The Garrity doctrine
comes from the holding of the Supreme Court case  of Garrity v. New Jersey, 385 U.S.
493,  87 S. Ct. 616 (1967).  It protects an officer who is required to
make incriminating statements as part of an investigation by excluding the
officer=s statements from use in
a future prosecution of that officer.  Id.
at 500, 87 S. Ct. at 620.





[5]Specifically, she argued,
AThis man is responsible
for what happened that day.  He decided
it was suicide by cop.  That=s how he was going to go
out, shooting it out with the police.@  Later,
she continued, AThey want to make a big
deal about him not flushing the drugs [that were later found in the apartment]
. . . .  That=s because he had made the
decision to fight.  He had made the
decision to shoot it out.  He wasn=t going back.@





[6]After the trial court
refused to allow questions about Garrity, appellant attempted to ask
Sergeant White what CLEET is, the organization that provided the attorney to
Sergeant White.  The State, as with the Garrity
question, objected to the relevance of the question, and the trial court
sustained the objection.  This was after
appellant had already established the fact that Sergeant White had an attorney
present during the investigation. 
Although appellant states in his brief that the trial court abused its
discretion by curtailing this line of questioning as well, it is unclear
whether he seeks reversal on that issue. 
Nevertheless, for the same reasons that we find no abuse of discretion
in the relevancy determination made by the trial court concerning Garrity,
we decline to hold that the trial court abused its discretion by refusing to
allow questions concerning CLEET, which is the Afraternal advisory board
for police officers in the State of Texas.@  See
Tex. R. App. P. 38.9 (providing that we are to construe briefs liberally); Barnett
v. State, 161 S.W.3d 128, 132 (Tex. App.CFort Worth 2005), aff=d, 189 S.W.3d 272
(2006).  We cannot discern any reason why
the identity of the organization that provided Sergeant White=s attorney would have any
bearing on whether Sergeant White had a potential bias or motive to testify
untruthfully.  Therefore, we will not
disturb the trial court=s determination.  See Green, 934 S.W.2d at 101B02.





[7]The trial court provided
the following instruction on self defense: 

 

Upon the law of
self-defense, you are instructed that a person is justified in using force
against another when and to the degree he reasonably believes the force is
immediately necessary to protect himself against the other person=s use or attempted use of
unlawful force.

 

The use of force against
another is not justified to resist an arrest that the actor knows is being made
by a peace officer.

 

. . . .

 

AReasonable belief@ means a belief that
would be held by an ordinary and prudent man in the same circumstance as the
actor.

 

. . . .

 

When a person is attacked
with unlawful deadly force, or is subject to an attempted attack with unlawful
deadly force, and there is created in the mind of such person a reasonable
expectation or fear of death or serious bodily injury, then the law justifies
such person in resorting to deadly force when and to the degree that he
reasonably believes the deadly force is immediately necessary, to protect
himself from another=s use or attempted use of
unlawful deadly force.

 

. . . .

 

Now, if you find from the
evidence beyond a reasonable doubt that on the occasion in question, the
defendant, Korey Demaine Walker, committed the offense of attempted capital
murder or aggravated assault as charged in the indictment or any lesser
included charge, but you further have a reasonable doubt from the evidence that
Korey Demaine Walker reasonably believed that his life or person was in danger
and reasonably believed that the use of deadly force on his part was
immediately necessary to protect himself against A.M. Tatsch=s use or attempted use of
unlawful deadly force and that his use of force was not for the purpose of
resisting arrest that the defendant knew was being made by a peace officer, he
shot A.M. Tatsch with a firearm . . . then you shall acquit the
defendant on the grounds of self-defense . . . .

 

In a separate paragraph,
immediately following the instruction on self-defense, the trial court provided
the following instruction on mistake of fact:

 

It is a defense to prosecution
that the defendant, through mistake, formed a reasonable belief about a matter
of fact if his mistaken belief negated the kind of culpability required for the
commission of the offense. >Reasonable belief= means a belief that
would be held by an ordinary and prudent man in the same circumstances as the
actor.

 

Therefore, if you have a reasonable doubt
from the evidence whether on the occasion in question the defendant, Korey
Demaine Walker, through mistake, formed a reasonable belief that A.M. Tatsch
was not a peace officer . . . lawfully discharging an official
duty, you will find the defendant not guilty of the offenses charged against
him in the indictment and consider whether the defendant is guilty of a lesser
included offense.





[8]Appellant relies
exclusively on the court of criminal appeals=s decision in Rankin in asserting that the
trial court had a responsibility to further instruct the jury about the
impermissible uses of impeachment testimony, specifically, that it may not be
used to determine guilt.  Appellant
points to language in Rankin in which the court of criminal appeals
states that Rule of Evidence 105(a) A>restrict[s] the evidence to its proper scope,= [and] does so as
effectively as possible.@  Rankin, 974 S.W.2d at 712 (quoting
Tex. R. Evid. 105(a)).  Appellant asserts
that the language, Aas effectively as
possible,@ requires courts to set
all of the boundaries on the use of impeachment testimony by instructing juries
about the correct and incorrect uses. 
But this is too broad a reading of Rankin.  After it decided Rankin, the court of
criminal appeals held that Athe precise issue discussed [in Rankin]
was whether the trial court had discretion to postpone giving a limiting
instruction until the jury charge when the defendant had requested such an
instruction at the time the evidence was admitted.@  Hammock v. State, 46 S.W.3d 889, 893
(Tex. Crim. App. 2001) (citing Rankin, 974 S.W.2d at 707).  Rankin requires courts to provide a
contemporaneous limiting instruction when impeachment testimony is introduced
and the defendant requests such an instruction so as to Arestrict the evidence to
its proper scope@ by preventing the jury
from improperly considering the evidence for a period of time.  Rankin, 974 S.W.2d at 712.





[9]For instance, the final
thought the State left the jury with began as follows, ABasically, what it comes
down to is, do you believe?  Do you
believe an officer with the Tarrant County Sheriff=s Department, who is now
a sergeant, or do you believe a criminal? 
The offense you choose depends on the version of the facts that you
believe . . . .@





[10]Appellant admitted that
Williams and another person had told him three to four months before the
shooting that the fugitive squad was looking for him. 





[11]Appellant testified that
he looked out the window, but he did not see anyone outside.





[12]Although appellant
testified that he was awakened by something that sounded like it was Abrushing up@ against, or bumping, the
wall by the patio, he nevertheless denied hearing any of the knocking and
announcing even though he was awake and made several phone calls during that
time.  In contrast, Cross, who was standing
outside the apartment near the patio door with Deputy Pickle, testified that he
heard the officers announce themselves once inside the apartment.





[13]Appellant had testified
that he thought he was in danger from a man with whom he had had a prior
altercation and that that man was the one who had broken into the apartment.





[14]Appellant also denied
hearing this announcement.





[15]Although the dissent
notes that the forensics testimony supports appellant=s version of events, we
must likewise point out that it equally supports Deputy Tatsch=s version of events.  And the same evidence detailed above, coupled
with the fact that appellant did not destroy drugs officers later found in
plain view inside the apartment, supports the Asuicide by cop@ theory independently of
Smith=s testimony.





[1]Tex. R. Evid. 105(a).





[2]Black=s Law Dictionary 1315 (6th ed. 1990).





[3]Webster=s Third New Int=l Dictionary 1937 (2002).





[4]Rankin v. State, 974 S.W.2d 707, 712
(Tex. Crim. App. 1996) (citations omitted).





[5]Hammock v. State, 46 S.W.3d 889, 894
(Tex. Crim. App. 2001) (citations omitted).





[6]Id.





[7]See McMurrough v. State, 995 S.W.2d 944, 948 (Tex.
App.CFort Worth 1999, no
pet.).